IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 17-23960-JAD |
| | ) | |
| KEVIN S. MOSER, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Related to Doc. No. 163 |
| ——————————————— | X | |
| | ) | |
| INNOVATIVE BUILDING | ) | |
| SOLUTIONS, LLC, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| -vs.- | ) | |
| | ) | |
| KEVIN MOSER, Debtor, and | ) | |
| ERIC BONONI, Esq., Chapter 7 | ) | |
| Trustee, | ) | |
| | ) | |
| Respondents. | ) | |
| ——————————————— | X | |

## MEMORANDUM OPINION

The matter before the Court is the *Motion to Dismiss Bankruptcy Pursuant to Section 707 of the Bankruptcy Code* (the "Motion to Dismiss," ECF No. 163) filed by creditor, Innovative Building Solutions, LLC ("IBS").  By its Motion, IBS seeks to dismiss the Debtor's bankruptcy case on account of the Debtor's alleged bad faith conduct.

### I.

The Motion to Dismiss is a core proceeding over which this Court has the requisite subject matter jurisdiction to enter final judgment pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A). For the reasons set forth below, the Court shall enter an order denying the Motion to Dismiss.

## II.

By way of background, the Debtor, Kevin S. Moser, commenced his bankruptcy case by filing a voluntary petition under chapter 13 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) on October 3, 2017.

IBS is a creditor of the Debtor. The relationship between the Debtor and IBS is that the Debtor, a commercial contractor, performed work for IBS on approximately twenty-five projects beginning in 2009. See *Joint Stipulation of Facts and Evidentiary Appendix* (the "Joint Stipulation") ¶¶ 1-2, ECF No. 169. However, the relationship soured. On July 28, 2017, IBS brought suit against the Debtor and a co-defendant in state court alleging negligence, breach of contract, and unjust enrichment claims. See Joint Stipulation ¶¶ 3-4.

In his initial petition, the Debtor scheduled $438,000 in assets and $59,000 in debts. See Joint Stipulation ¶ 15. Included in the total assets was an entry for "Business Equipment" valued at $200,000 and an entry for residential real property valued at $180,000. See *Schedule A/B: Property*, ECF No. 13 at 3, ¶ 1.1, and 8, ¶ 40. The Debtor also listed IBS in his *Schedule E/F: Creditors Who Have Unsecured Claims* as having a disputed claim valued at $0.00 and the entry was designated for "Notice Only." See ECF No. 13 at 14, ¶ 4.2.

Along with his completed petition, the Debtor filed a chapter 13 plan proposing to pay one hundred percent of the Debtor's uncontested, unsecured creditors (then totaling $16,052.23). See *Chapter 13 Plan Dated November 5, 2017* 4, ¶ 16, ECF No. 14. IBS objected to the plan. See *Innovative Building*

*Solutions, LLC's Objection to Confirmation of Debtor's Chapter 13 Plan Dated November 5, 2017*, ECF No. 19. IBS later filed a proof of claim in the amount of $324,248.00 on February 13, 2018. <u>See</u> Proof of Claim 4-1.  The Debtor objected to IBS's claim, but the objection was ultimately overruled by the Court.[1]

On January 8, 2020, the Debtor's case was converted to one under chapter 7 because of the Debtor's inability to confirm a plan which satisfied the liquidation alternative requirement imposed by 11 U.S.C. § 1325(a)(4).[2] <u>See</u> Transcript of hearing held January 8, 2020 (the "<u>January 8, 2020 Tr.</u>"), ECF No. 181. IBS's Counsel, present at the January 8, 2020 hearing, agreed to the conversion. <u>See</u> January 8, 2020 Tr. 3.

Thereafter an order was entered converting the case to chapter 7 and setting deadlines to object to the good faith of the conversion. <u>See</u> Order dated January 8, 2020 (the "<u>Order Converting Case</u>"), ECF No. 110. No objection was timely filed by any party, including IBS.

Following conversion of the Debtor's case to chapter 7, on February 13, 2020, the Debtor amended several schedules, including Schedule A/B to reflect a downward adjustment in the value of both the Debtor's residence to $75,000 and his business equipment to less than $20,000. <u>See</u> Joint Stipulation ¶ 34;

---

[1] The Debtor's objection to IBS's claim was overruled on account of its untimeliness and the Debtor's failure to sufficiently rebut the prima facie validity of IBS's Proof of Claim. <u>See</u> Transcript of hearing held December 12, 2018, ECF No. 178.

[2] Section 1325 of Title 11 requires for chapter 13 plan confirmation that, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of [Title 11] on such date[.]" <u>See</u> 11 U.S.C. § 1325(a)(4).

*see also* Amended *Schedule A/B: Property*, ECF No. 122 at 3, ¶ 1.1, and 8, ¶ 40. The non-exempt property of the Debtor was thereafter liquidated by the Chapter 7 Trustee.  The purchaser of the assets was IBS for a total of $15,500.00.  <u>See</u> Order dated June 2, 2020, ECF No. 148.

Following the sale, IBS was granted leave, without objection, to examine the Debtor pursuant to Bankruptcy Rule 2004 on July 28, 2020.  IBS then filed the instant Motion to Dismiss on September 15, 2020, citing, in part, to the Debtor's testimony at the Rule 2004 exam.

## III.

This case was originally filed under chapter 13 of the Bankruptcy Code. Although by its Motion to Dismiss, IBS challenges the good faith of the Debtor's bankruptcy case since inception, the law provides that post-conversion the issue of whether the Motion to Dismiss should be granted is governed by 11 U.S.C. § 707(a).[3]  <u>See</u> <u>Blumenberg v. Yihye (In re Blumenberg)</u>, 263 B.R. 704, 712 (Bankr. E.D.N.Y. 2001)(dismissal of case converted from chapter 11 to chapter 7 is determined pursuant to 11 U.S.C. § 707).

Section 707(a) of Title 11 provides as follows:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including--

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

---

[3] Although the Motion to Dismiss identified 11 U.S.C. § 707 generally as the statutory authority for relief, IBS later narrowed its basis for relief to § 707(a). <u>See</u> Motion to Dismiss ¶¶ 3, 41-42. To the extent IBS seeks relief under other subsections of 11 U.S.C. § 707, such requests are insufficiently set forth to merit consideration by the Court.

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

<u>See</u> 11 U.S.C. § 707(a).

Before wading into the merits of IBS's Motion to Dismiss pursuant to 11 U.S.C. § 707(a), the Court must first address the timeliness of the Motion.

<u>The Motion to Dismiss is Time Barred</u>

Unlike a motion to dismiss brought pursuant to 11 U.S.C. §§ 707(b) or 707(c), the Bankruptcy Code and Rules provide no express, universal deadline for commencing a motion under 11 U.S.C. § 707(a).  <u>See</u> <u>In re Champion</u>, 600 B.R. 459, 464 (Bankr. S.D. Ga. 2019).[4]  However, this absence does not mean that a movant's time to seek dismissal is unlimited. <u>See</u> <u>e.g.</u> <u>In re Dini</u>, 566 B.R. 220 (Bankr. N.D. Ill. 2017)(despite lack of statutory deadline to assert 11 U.S.C. § 707(a) claim, movant barred from seeking dismissal pursuant to 11 U.S.C. § 707(a) by doctrine of laches due to unreasonable delay in asserting claim and prejudice to debtor); <u>In re Champion</u>, 600 B.R. at 468-471 (United States

---

[4] The issue of whether a motion to dismiss is effective or timely if filed after a debtor becomes entitled to a discharge but before the discharge order is actually entered is an area of law not widely written about. <u>See</u> <u>Champion v. Morris Bank</u>, CV 319-029, 2019 WL 3729558, at *3 (S.D. Ga. Aug. 7, 2019)("The Court is unable to find any case that specifically addresses whether a § 707(a) motion to dismiss filed after the objection deadline but before discharge is entered prevents a bankruptcy court from entering discharge."). This Court notes that a motion to dismiss may become moot after a debtor's discharge is entered, unless the movant can successfully establish grounds for revocation under 11 U.S.C. § 727(d). Thus, a movant seeking to dismiss should file its motion before a debtor becomes entitled to entry of a discharge in accordance with Rule 4004(c).

Trustee's time to seek dismissal under 11 U.S.C. § 707 was limited by the terms

of a consent order).

*Sub judice*, this Court expressly limited the time to challenge the good faith

conversion of the Debtor's bankruptcy case from chapter 13 to chapter 7.

Specifically, included in the conversion order dated January 8, 2020, was the

following directive:

> Any party-in-interest that challenges the good faith of the conversion
> shall, on or before *January 28, 2020*, file a motion setting forth the
> basis of the challenge and specifically identifying the relief requested
> in the event conversion is found not to have been made in good faith.

Order Converting Case at ¶ 1.

No such motion was made by IBS, nor any other party by the deadline.

Although the mandate does not expressly reference 11 U.S.C. § 707(a), the

Court's reference to "good faith" of the conversion was sufficient to put IBS on

notice of a need to bring any § 707(a) challenge to the conversion—as opposed

to dismissal outright—by the deadline. Thus, the Motion to Dismiss is untimely.

The Court acknowledges that in the Motion to Dismiss and at the

November 3, 2020 hearing, IBS highlighted that some of the bases for its "bad

faith" claim—i.e. the amended schedules and Debtor's motivation for filing—were

not firmly discovered until after the January 28, 2020 deadline had passed. The

Court is not persuaded by this argument.

While it is true that the Debtor's amended schedules were not filed of

record until February 13, 2020, IBS was previously made aware or should have

been aware that the assets were overvalued in the Debtor's original schedules.

Indeed, at the hearing held November 13, 2019, Debtor's Counsel represented to

6

the Court that the values assigned to the Debtor's assets in his Schedule A/B were likely overstated. Further, Debtor's Counsel stated that if the case were converted to a chapter 7, there would "probably [be] a minimal liquidation distribution." See Transcript of hearing held November 13, 2019 (the "November 13, 2019 Tr.") 2, ECF No 180.  In this regard, Debtor's Counsel indicated that Debtor's real property, originally scheduled at $180,000 was appraised at $75,000. See November 13, 2019 Tr. 5-6. Additionally, it was recognized that the business assets originally scheduled at $200,000, were now estimated as being worth "maybe $30,000." See November 13, 2019 Tr. 13. Counsel further explained that the Debtor had utilized a replacement value to estimate worth when he originally filed his schedules as opposed to a fair market value. Id. Counsel for IBS was in attendance for the November 13, 2019 hearing, and was fully advised as much.

The inaccuracy of the Debtor's schedules was further communicated to IBS through the Debtor's delivery of the real property appraisal to IBS on November 19, 2019, and by the Debtor's written discovery responses produced on December 12, 2019. See Joint Stipulation ¶¶ 30-31.

Moreover, IBS itself acknowledged in its *Pre-Hearing Statement* filed January 8, 2020 that the Debtor believed the asset valuations to be inflated. See ECF No. 107 at 3 ("Recently, representations made by Debtor's counsel call into question the accuracy of Debtor's schedules. Specifically, during a prior hearing in this matter held on November [13], 2019, Debtor's counsel acknowledged that

asset valuations contained within the Debtor's bankruptcy schedules were inflated.")

With respect to the Debtor's filing being motivated by the IBS lawsuit, the Debtor's timing of the bankruptcy petition in relation to the state court proceedings was always known, as well as the Debtor's income at the outset of this bankruptcy case and his limited debts.[5]

In contrast to IBS's position, the Debtor argues that IBS should be estopped from obtaining the benefits of the liquidation that occurred under the auspices of chapter 7 and then seeking dismissal. This Court agrees. IBS not only did not object to the Debtor's conversion to chapter 7, but <u>outright supported it</u>. In converting to chapter 7—as opposed to having his case dismissed—the Debtor submitted his non-exempt business equipment for liquidation for the benefit of his creditors, including IBS, potentially hampering the Debtor's ability to generate income going forward. Now that the Debtor's non-exempt assets have been liquidated, IBS seeks dismissal. IBS clearly wants for itself all the benefits of being a creditor in a chapter 7 case without the burden

---

[5] Moreover, the Court notes that the *Conciliation Conference Minutes* for the July 25, 2019 meeting of creditors indicate that IBS believed grounds existed to support a finding of bad faith prior to the January 28, 2020 deadline to object to conversion. The minutes read that "Innovative Building Solutions requests the case be converted in lieu of dismissal on the basis that it believes case filed in bad faith, a substantial delay that is prejudicial to creditors, and because of material equity that is believed to exist in Debtor's [real estate] & business personalty that can fund distribution to [unsecured creditors]." <u>See</u> *Conciliation Conference Minutes*, attached as Exhibit E, p. 4 to the Motion to Dismiss. IBS also alleged in its *Pre-Hearing Statement* filed on January 8, 2020 that the Debtor had engaged in a pattern of bad faith conduct in pursuing his chapter 13 bankruptcy case. <u>See</u> ECF No. 107 at 3-6. The *Pre-Hearing Statement* was filed just prior to the hearing held that day at which IBS agreed to the Debtor's conversion to chapter 7. <u>See</u> January 8, 2020 Tr. 3.

of the Debtor's discharge, while at the same time seeking to impose all the burdens of a chapter 7 on the Debtor (i.e. asset liquidation) without the benefit of discharge. This is not within the intent and spirit of the Bankruptcy Code. For this reason, the Court finds the Motion to Dismiss untimely.

Even if the Motion to Dismiss were deemed to be timely, the Court would nonetheless deny the Motion to Dismiss on its merits.

Section 707(a) of the Bankruptcy Code permits a court to dismiss a chapter 7 case for "cause." See 11 U.S.C. § 707(a). Although not expressly provided for in the non-exhaustive list of what constitutes "cause" thereunder, the Third Circuit Court of Appeals has observed that § 707(a) permits dismissal for lack of good faith in filing a bankruptcy case. See Tamecki v. Frank (In re Tamecki), 229 F.3d 205, 207 (3d Cir. 2000). Adding, that "[a]lthough the Code does not define 'good faith,' courts in this circuit have uniformly held that '[a]t the very least, good faith requires a showing of honest intention.' " See id. (quoting In re Marks, 174 B.R. 37, 40 (E.D. Pa. 1994)).

Whether to dismiss a case for lack of good faith is within the sound discretion of the bankruptcy court. See In re Tamecki, 229 F.3d at 207. Nonetheless,

> [d]ismissal based on lack of good faith . . . should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence.

Id. at 207 (quoting Indus. Ins. Servs., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1129 (6th Cir. 1991)); see also Perlin v. Hitachi Capital Am. Corp. (In re Perlin),

497 F.3d 364, 373 & 375 (3d Cir. 2007)(citing <u>Tamecki</u>, and also finding that a case was not filed in bad faith where there was no evidence that the debtors schemed to conceal or misrepresent income, inflated expenses to hide income, filed misleading statements or schedules as an effort to defraud creditors, unduly interfered with the judicial process, or engaged in other misconduct); <u>and</u> <u>In re Marks</u>, 174 B.R. at 40-41  (citing <u>Zick</u>, and also observing that most instances of bad faith under § 707(a) involve "concealment, misrepresentation, or unexplained transfers to place assets beyond the reach of creditors" and that in the absence of those circumstances it is not an abuse of discretion to find a lack of bad faith).

In evaluating good faith, the court "must decide whether the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." <u>In re Tamecki</u>, 229 F.3d at 207. Once the good faith of the petitioner's filing is placed in question, the petitioner has the burden of showing it is a good faith filing. <u>See</u> <u>In re Sky Grp. Int'l, Inc.</u>, 108 B.R. 86, 90 (Bankr. W.D. Pa. 1989); <u>see also</u> <u>In re Tamecki</u>, 229 F.3d at 207.

Determinations of good faith are "ad hoc" assessments which take into consideration all of the facts and circumstances surrounding a bankruptcy case filing. <u>See</u> <u>In re Perlin</u>, 497 F.3d at 372 (citing <u>NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)</u>, 384 F.3d 108, 118 (3d Cir. 2004)(the good faith analysis is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine

where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive").

In assessing the totality of the circumstances, the court "may consider a wide range of factors, including, 'the nature of the debt . . .; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.' " In re Myers, 491 F.3d 120, 125 (3d Cir. 2007) (quoting In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996)).[6]

As some of these factors are intertwined, the Court will examine related factors together.

### Timing of Petition & Motive for Filing Petition

IBS filed its state court lawsuit against the Debtor on July 28, 2017, and the Debtor commenced his bankruptcy case roughly two months later on October 3, 2017.  See Joint Stipulation ¶ 3.  In his Rule 2004 examination testimony, the Debtor stated that his bankruptcy filing was due to the IBS lawsuit. See Remote 2004 Examination of Kevin Moser (the "Rule 2004 Exam Tr.") 75, attached as Exhibit B to the Joint Stipulation. IBS argues that this

---

[6] In In re Myers, the Third Circuit observed in light of Mrs. Myers request to convert to chapter 7, that "Chapter 7 cases are subject to the same requirement of good faith as Chapter 13 cases." 491 F.3d at 127 (citing In re Tamecki, 229 F.3d at 207). In Myers, the bankruptcy court "concluded that the same factors that indicated that Mrs. Myers filed her Chapter 13 cases in bad faith would apply with equal force to her Chapter 7 filing." In re Myers, 491 F.3d at 127.

admission, along with the timing of the petition and general ability to pay bills at the time of filing, is evidence of bad faith.

While the suspicious timing of a bankruptcy petition is a factor for the court's consideration of bad faith, the Third Circuit has observed that the commencement of a bankruptcy case "during the pendency of related state court litigation is not necessarily in bad faith." In re Myers, 491 F.3d at 125. In such circumstances, bankruptcy courts may find bad faith "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization [or bankruptcy] purpose." In re Myers, 491 F.3d at 125 (quoting In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994)).

The Court finds that the Debtor has shown a valid reorganization and/or bankruptcy purpose behind his filing for bankruptcy relief.

It is true that the Debtor proffered sworn testimony indicating that at the time of case filing he was not "very delinquent" on his bills and was not experiencing significant issues paying his bills. See Rule 2004 Exam Tr. 75. However, the pending IBS lawsuit represented a significant financial obstacle for the Debtor. Even though the Debtor believed the lawsuit lacked merit, he testified that he could not afford to defend himself as IBS had "deeper pockets." See Rule 2004 Exam Tr. 74-77. This inability to defend himself pushed the Debtor into bankruptcy.

12

The record further reflects that unlike other cases where a debtor files solely to forestall foreclosure or execution without an intention to reorganize,[7] the Debtor testified that his plan was to pay his creditors back over a five-year period in chapter 13. See Rule 2004 Exam Tr. 58, 78-79. Consistent with his testimony, the Debtor's subsequent actions evidence his intent to do so.

On November 7, 2017, the Debtor timely filed a proposed chapter 13 plan, which initially proposed to pay off one hundred percent of the then uncontested unsecured claims totaling $16,052.23 (the debt to IBS was listed as contested). The Debtor faced several obstacles in his reorganization efforts, including an injury which impacted his ability to generate income and an unsuccessful effort to object to IBS's claim, which ultimately thwarted his chapter 13 efforts. However, failure to successfully complete a chapter 13 does not automatically mean that the debtor did not intend to reorganize at the outset.

---

[7] See e.g. In re Mondelli, 558 F.App'x 260 (3d Cir. Mar. 7, 2014)(finding the debtor's case was filed in bad faith where the debtor had previously sought and was denied multiple stays of the sheriff's sale against commercial property, the co-owner's bankruptcy case was filed and dismissed as being in bad faith just prior to the debtor's own filing, and the debtor's purported plan was illusory); In re Knauss, Nos. CA 13-01131-WY, BKY 12-17482-SR, 2013 WL 5942391 (E.D. Pa. Nov. 5, 2013)(serial bankruptcy filer's latest chapter 13 petition was filed in bad faith when property subject of sheriff's sale was transferred without meaningful consideration on eve of sheriff's sale and the debtor commenced bankruptcy case the morning of the scheduled sale); In re Joobeen, 385 B.R. 599, 611 (E.D. Pa. 2008) (serial filer's history of commencing bankruptcy cases when creditors took adverse action against him in state court and ceasing prosecution of his bankruptcies when state court threat was no longer imminent, in addition to other issues of candor, supported finding of bad faith);and Ruth v. Swigert (In re Swigert), 601 B.R. 913 (Bankr. M.D. Pa. 2019) (debtors' second chapter 13 filing, commenced during the pendency of their first chapter 13 case after entry of an order in that first case granting relief from stay as to certain collateral, was commenced in bad faith as debtors sought to circumvent 11 U.S.C. § 109(g)(2) by filing second case prior to voluntarily dismissing their first case in order to obtain further stay of actions against the collateral).

Notably, at the time of the Debtor's conversion, the chapter 13 trustee represented that the Debtor was current on his then pending chapter 13 plan payments—albeit the plan was insufficient to meet the liquidation alternative requirement. See January 8, 2020 Tr. 2.

At that point the trustee requested conversion, which the Debtor did not object to despite being aware that conversion to chapter 7 would open his assets up to liquidation for the benefit of his creditors, including IBS. See January 8, 2020 Tr. 2-4. And, that is exactly what happened.

In view of these circumstances, the Court finds that the Debtor commenced the case with a valid bankruptcy purpose and not simply as a means to deprive the state court of jurisdiction and forestall creditor collection activity. Here, the Debtor, a non-serial filer, took significant reorganizational steps including filing a plan, objecting to IBS's claim, making plan payments, and when ultimately unsuccessful, agreeing to convert to a liquidation scenario for the benefit of his creditors. Thus, the bankruptcy was not just a means to shield his income or assets.

Accordingly, the factors of timing of the petition and motive for filing weigh in favor of denying the Motion to Dismiss.

<u>Nature of the Debt & How the Debt Arose</u>

The Court next looks at the nature of the debt and how it arose. It has been said that these factors look "at whether the incurring of a debt resulted from bad acts or intentions of the debtor." Hamm v. Manfredi (In re Manfredi), 434 B.R. 356, 359 (Bankr. M.D. Pa. 2010).

14

As stated above, the IBS debt arises from the professional relationship between the Debtor and IBS. The Debtor performed work as a construction contractor for IBS on approximately twenty-five projects beginning in 2009. <u>See</u> Joint Stipulation ¶¶ 1-2. However, the relationship soured, and IBS ultimately brought suit against the Debtor and a co-defendant, alleging negligence, breach of contract, and unjust enrichment claims. <u>See</u> Joint Stipulation ¶ 4. Specifically, IBS alleged that the Debtor "negligently performed construction activities below the acceptable standard of care, negligently damaged equipment, refused to complete work, and performed actions and activities outside the scope of his work or intended work in a negligent manner which damaged property other than his own work." <u>See</u> Joint Stipulation ¶ 5. Also, that the Debtor "left existing construction Projects for IBS in a dangerous condition for third parties; agreed to perform actions on behalf of [Innovative] outside the scope of any agreements with [Innovative]; performed negligent construction in an accelerated and haphazard manner without regard to safety standards or manufacturer's direction; and created damage to property on Projects that did not involve his work." <u>See</u> Joint Stipulation ¶ 6.

In review of the claims asserted, including a reading of the state court complaint, the Court is not of the view that the underlying debt is the product of "conduct akin to fraud, misconduct or gross negligence" that would qualify the matter as the type of "egregious case" to which a finding of bad faith should be confined. <u>See</u> <u>In re Myers</u>, 491 F.3d at 126 (that the underlying debt was incurred for fraudulent conveyance was properly considered in finding bad faith). <u>See also</u>

15

In re Manfredi, 434 B.R. at 360 (even if allegation was true that debt was due, in part, to gambling, it would not support a finding of bad faith).

In assessing the alleged egregiousness of the conduct underlying the debt, the Court finds influential IBS's own decision not to pursue a denial of discharge or determination of non-dischargeability under 11 U.S.C. §§ 727 and/or 523. See e.g. 11 U.S.C. § 523(a)(6)(which excepts from discharge debts incurred for "willful and malicious injury") or § 523(a)(4)(which excepts debts for "fraud"). The Third Circuit Court of Appeals wrote in In re Myers, that the nature of the debt and manner in which it arose are not solely relevant to dischargeability actions, but also to good faith determinations. See 491 F.3d at 126. The fact that IBS did not seek relief under 11 U.S.C. §§ 523 and/or 727 is telling. Especially considering that the deadline to file certain of those actions (April 14, 2020), fell two months after the filing of the amended schedules and was approximately two and a half months after the January 28, 2020 deadline to object to conversion. See Notice of Chapter 7 Bankruptcy Case, ECF No. 113, ¶ 9. Thus, well after IBS either knew or should have known that its claim would not be fully paid out of the sale of estate assets.[8]

---

[8] This Court acknowledges that at the November 3, 2020 hearing on the Motion to Dismiss, Counsel for IBS explained that no action was taken to challenge the entry of the Debtor's discharge as to all or some of his debts because the full extent of the Debtor's alleged bad faith conduct was not apparent until the Rule 2004 examination. In particular, IBS's Counsel pointed to the Debtor's testimony that his bankruptcy filing was motivated by the state court lawsuit by IBS. See November 3, 2020 Hr'g at 10:47-10:52. However, as set forth above, the timing of the Debtor's bankruptcy filing was always known. Additionally, IBS argued in its Pre-Hearing Statement that: "Th[e] disparity between identified assets and identified liabilities indicates that the primary purpose of the Debtor's bankruptcy filing was to avoid a judgment being entered against him concerning the harms he previously caused to Innovative." See ECF No. 107 at 4. While Counsel for IBS argues that the Rule 2004 examination testimony is more

16

Accordingly, the nature of the Debt and how it arose does not weigh in favor of dismissal. In fact, the record of this case is that the Debtor is *bona fide* in pursuing a bankruptcy discharge of his debts.

Lack of Candor

The next factor is whether the debtor has been forthcoming with the bankruptcy court and creditors. The Court finds that this factor weighs in favor of denial of the Motion to Dismiss.

IBS avers that the Debtor has not been forthcoming with the Court and cites to the Debtor's delay in amending schedules to reduce the value of certain assets. What is unique about IBS's argument is that IBS does not allege that the Debtor has "conceal[ed] or misrepresent[ed] income, inflated [his] expenses to hide income" or otherwise concealed, misrepresented, or inexplicably transferred assets to "place [them] beyond the reach of creditors," which is found in most instances of bad faith. See Perlin, 497 F.3d at 375; Marks, 174 B.R. at 40-41. Instead, IBS alleges that it was the Debtor's initial overvaluation of his disclosed assets and alleged failure to timely correct them that demonstrate a lack of candor. In this respect, IBS does allege that the Debtor knowingly misled IBS as to the value of his assets, but such overvaluations did not conceal or otherwise place the assets beyond the reach of creditors.

---

concrete and lessens the need for IBS to rely on circumstantial evidence to prove the Debtor's motivation for filing, the fact of the matter is that IBS was aware of the circumstances surrounding the Debtor's filing in relation to the IBS lawsuit prior to the April 14, 2020 deadline to commence certain actions under 11 U.S.C. §§ 523 and 727. Moreover, that IBS was already confident enough in its argument to raise it in a court filing.

As to the effect of the overvaluations, IBS argues that the improper overvaluation caused IBS to pursue a course of litigation that it might otherwise not have pursued; specifically, in objecting to the Debtor's chapter 13 plans due to failure to satisfy the liquidation alternative analysis.  Also, that despite being aware of the issues in October 2019, the Debtor sought conversion and permitted the objection period to run before formally amending his schedules. The Court is not persuaded by IBS's argument.

The Debtor's sworn testimony is that the valuation issues or mistakes were not discovered until October 2019, and such issues were disclosed on the record at the November 13, 2019 hearing. See Rule 2004 Exam Tr. 84-89. During the November 13, 2019 hearing, it was explained that the Debtor incorrectly valued his assets using a replacement value as opposed to a fair-market value. In his Rule 2004 examination, the Debtor testified to his confusion and lack of understanding about how he was to value his assets. See Rule 2004 Exam Tr. 89. Thus, these circumstances suggest a lack of bad faith intent. See Andrews v. Kerschner (In re Kerschner), 246 B.R. 495, 499 (Bankr. M.D. Pa. 2000)(mistakes in debtor's schedules were immaterial to finding of bad faith where there is no evidence that mistakes were more than mere oversight).

 Based on the timing of discovery in October 2019, the valuation issues were not known to the Debtor at the time IBS filed its plan objections in December 2017 and October 2018.  And, although immediate formal amendment of schedules would have been preferable, both the Court and the creditors either were, or should have been aware, of the valuation issues prior to conversion and

18

expiration of the objection period. Thus, it could not be said that the Debtor

overstated the value of the assets as a means to defraud the Court and creditors.[9]

Supporting a lack of intent to defraud, the Court observes that the Debtor's

mistaken overvaluation of assets hampered his own efforts to reorganize under

chapter 13 by erroneously inflating the amounts necessary to satisfy the

liquidation alternative analysis. Thus, forcing the Debtor into a chapter 7 case

in which his non-exempt assets were liquidated for the benefit of creditors. Of

course, the liquidated assets consisted of construction equipment the Debtor

used to generate income. To find that the Debtor intended to defraud creditors

by his overvaluations would be to find that the Debtor proverbially "cut off his

nose to spite his face." While there is animosity between the parties, the Court

is not convinced that this is the case.

In addition to the mistaken overvaluation of assets, IBS also points to

several instances where the Debtor missed deadlines or failed to comply with

court orders throughout his case.  Debtors undoubtedly have a duty to comply

with the applicable statutes, rules, and court orders, and such compliance is

important to the proper functioning of the bankruptcy process.  <u>See</u> 11 U.S.C. §

---

[9] At the November 3, 2020 hearing on the Motion to Dismiss, IBS alleged that the Debtor's less than perfect efforts to timely or promptly answer discovery related to the Chapter 13 Trustee's discovery requests in connection with the confirmation dispute— in that, the Debtor failed to supply all requested documents—evidences an intent to hide the information and materially inflate his assets. <u>See</u> November 3, 2020 Hr'g at 10:10-10:13. The Court is unconvinced. The discovery requests were served on the Debtor on September 17, 2019. Although the Debtor failed to respond timely, the Court reset the deadline to respond at the November 13, 2019 hearing. <u>See</u> November 13, 2019 Tr. 18.  It was also at this hearing that IBS was put on notice that the asset valuations were overinflated. Thus, the Debtor's subsequent failure to provide all requested documents cannot be taken as the Debtor attempting to hide the overvaluations, as the Debtor had already brought the overvaluations to the Court's (and IBS's) attention.

521 (setting forth the duties of a debtor in bankruptcy). However, if the Court were to demand perfect adherence nary a debtor would successfully complete a bankruptcy case. In review of the record of this case, while the Debtor has indeed been imperfect, and this Court has at times expressed its frustration, the Court does not view the Debtor's conduct as rising to the level of egregiousness which would support dismissal.

<u>Debtor's Actions & Treatment of Creditors</u>

The final factors to consider are how the Debtor's actions affected creditors. "Generally, [the 'treatment of creditors'] factor looks at actions taken by the debtor to frustrate creditors." <u>See</u> <u>In re Manfredi</u>, 434 B.R. at 361.

At the outset, and as stated above, there is no allegation that the Debtor concealed or otherwise transferred assets in an effort to put them beyond the reach of his creditors. <u>See</u> <u>In re Myers</u>, 491 F.3d at 126 (debtor acted in bad faith by allowing withdraw of $6,000 from account in violation of court order); <u>In re Kerschner</u>, 246 B.R. at 498-499 (debtor's continued spending of decedent estate's assets in violation of court order while contemplating bankruptcy was consistent with bad faith).

Instead, relevant to these factors, IBS raises issue with: the Debtor's treatment of IBS due to Debtor's perceived failure to submit a claim to his insurance carrier on account of the IBS lawsuit before filing for bankruptcy, the Debtor's failure to follow through with its stated intent to attempt to negotiate a settlement, and the Debtor's alleged furtive conduct relative to asset inspection and sale.

20

Starting with the latter two, this Court does not find that the Debtor's failure to follow through with negotiations rises to the type of egregious conduct that warrants dismissal. As for the Debtor's conduct during the asset inspection and sale process, the Court notes that the Chapter 7 Trustee, who was tasked with such efforts, stated that he does not believe that the Debtor's actions relative thereto warrant a dismissal of the bankruptcy case. See Br. Resp. IBS's Motion to Dismiss 5-6, ECF No. 197. The Court puts much stock into the opinion of the Chapter 7 Trustee who witnessed first-hand the Debtor's behavior and who was directly impacted by the Debtor's conduct.

As for the final point, that the Debtor could have submitted a claim to his insurance carrier which would have potentially compensated IBS for its claim, IBS's position presumes that the Debtor's insurance coverage would have provided for the claim. However, this conclusion is something that the Debtor disputes on the theory that his insurance policy would not cover breach of contract claims, which is how the Debtor categorizes IBS's state court claims. See Debtor's Br. Opp'n Mot. Dismiss of Innov. Bldg. Sols. 15-16, ECF No. 201.[10]

Nonetheless, even if IBS would have been compensated through the policy, it is not evident that the Debtor acted with any animus or ill-intent in exercising his statutory right to seek bankruptcy protection or that his filing was to

---

[10] The Debtor raises the issue of whether IBS's state court claims would be viewed as breach of contract claims under Pennsylvania's gist of the action doctrine and, in turn, whether the insurance policy would cover those claims. The Court makes no findings with respect to these issues as they are not necessary to resolve the pending Motion to Dismiss.

frustrate IBS. In fact, the record reflects that the Debtor testified that he did not believe that the lawsuit had merit. Thus, in exercising his statutory right to file for bankruptcy, it does not appear that the Debtor was motivated by an intent to "shirk" responsibility, as the Debtor did not believe there was anything to "shirk" responsibility for.

In addition, IBS never petitioned this Court for relief from stay to pursue a claim against insurance. See In re Glunk, 342 B.R. 717, 740 (Bankr. E.D. Pa. 2006) (noting that "[u]nder § 362(d)(1), bankruptcy courts have routinely granted relief to permit personal injury plaintiffs to prosecute their claims in state court and to limit their collection efforts to the available insurance benefits"). Nor has any evidence been presented demonstrating that the Debtor hid or otherwise obstructed IBS from the discovery of an insurance policy.[11] To be clear, at the November, 3, 2020 hearing on the Motion to Dismiss, IBS alleged that insurance documents were requested pursuant to its Rule 2004 subpoena *duces tecum* and

---

[11] The fact that an insured does not tender a claim, does not necessarily vitiate coverage of a covered loss or erase a duty to defend. For example, if an insurer is put on notice of the claim by the injured party, the insurer would be hard pressed to ignore the claim. Despite third-party direct action limitations against insurers, see 40 Pa. Stat. Ann. § 117, the general rule is that:

> If the insurer has actual knowledge of the claim or suit, it may need to establish more than simply lack of notice in order to be relieved of any duty to defend the insured. Under the majority rule, an insurer is not relieved of its defense or indemnity obligations because its insured failed to provide it with demands or court papers unless a showing of prejudice can be established.

4 Philip L Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor on Construction Law § 11:132 (2020) (citations omitted); see Brakeman v. Potomac Ins. Co., 371 A.2d 193, 196 (lack of notice only is not sufficient for insurer to escape liability, prejudice is also required).

that the Debtor failed to comply with such request. <u>See</u> November 3, 2020 Hr'g at 11:10. However, this Court's review of the *Notice of the Taking of Rule 2004 Examination of Debtor Kevin Moser and Request for the Production of Documents* <u>does not</u> reveal a request for insurance documents. <u>See</u> Joint Stipulation, Ex. C. To the extent any of the requests therein could be interpreted to require the Debtor to provide insurance information, the record reflects that the Debtor did disclose his insurance provider to IBS during his Rule 2004 exam testimony. <u>See</u> Rule 2004 Exam Tr. 79-80.

Moreover, the Court notes that IBS either had or should have had the Debtor's insurance information even prior to the filing of his bankruptcy case. This is because certain of the purchase orders between IBS and the Debtor (which are attached to IBS's state court complaint) required the Debtor to provide IBS with insurance certificates.[12] This appears to have been done as the state court complaint enumerates the Debtor's alleged breaches of contract and at no time did IBS allege that the Debtor failed to provide the required insurance certificates. Additionally, the Debtor testified at his Rule 2004 exam that maintaining insurance coverage was a contractual requirement and he would have let IBS know of his insurance coverage. <u>See</u> Rule 2004 Exam Tr. 79-80. Further, the Debtor testified that he believes that IBS contacted his insurance

---

[12] IBS's state court complaint is filed on the docket as Exhibit A to the Joint Stipulation. The referenced purchase orders are attached to the complaint as exhibits "D" and "E." Both cited purchase orders contain the following language: "Subcontractor shall submit an insurance certificate for the said project, with adequate liability, automobile and wc limits as IBS may request." <u>See</u> Ex. D at 2, Ex. E at 3.

carrier directly, although he himself never put in a claim. See Rule 2004 Exam Tr. 80-82.

So, IBS surely knew or should have known of the insurance coverage, but never took any steps in the bankruptcy case to compel the Debtor or the Chapter 7 trustee to tender a claim.[13]

Accordingly, the Court finds that these last factors also weigh in favor of denying dismissal.

## Other Factors

In setting forth its decision, this Court is mindful that other courts within the Third Circuit have considered different and/or additional factors when evaluating a motion to dismiss for lack of good faith. For example, in In re Glunk, the Honorable Eric L. Frank of the United States Bankruptcy Court for the Eastern District of Pennsylvania opined that considerations when deciding a motion to dismiss under 11 U.S.C. § 707(a) could be distilled into the following five categories: (1) "the debtor's (extravagant) lifestyle and ability to pay[;]" (2) the disproportionate impact that bankruptcy relief would have on one particular creditor, or only a few creditors, as compared to other creditors[;]" (3) forum shopping or efforts to manipulate the judicial process to thwart the orderly determination of a creditor claim pending in another court[;]" (4) prepetition

---

[13] IBS's Counsel stated at the November 3, 2020 hearing that he believed, but could not state for certain, that a demand for the Debtor to submit a claim to his insurance was made by prior counsel before the bankruptcy filing. See November 3, 2020 Hr'g at 10:59-11:01. The Debtor testified that he did not recall IBS's counsel ever recommending that he (the Debtor) send the state court complaint to his insurance. See Rule 2004 Exam Tr. 80-81.

fraudulent conduct to place assets beyond the reach of creditors or less than full and candid disclosure in the bankruptcy process itself[;]" and (5) an end result, if bankruptcy relief is permitted, that is perceived to be fundamentally unfair or excessive[.]"  342 B.R. at 734.

For purposes of completeness, this Court also considers these factors.  In doing so, the Court finds that dismissal is not warranted.

As to categories 3 and 4, the Court has already discussed these considerations above—albeit under different labels—and found that neither weigh in favor of dismissal. Specifically, the Court's discussion regarding the timing and motive for filing the petition also establishes a lack of forum shopping or an effort to manipulate the judicial process (category 3).  The Court has also examined the Debtor's candor, finding it does not weigh in favor of dismissal, and noted that there is no allegation that the Debtor concealed or misrepresented assets to place them beyond the reach of creditors (category 4). Notably, although Judge Frank found that bad faith could be found on the basis of any one of the categories, he also suggested that "certain factors may carry substantially more weight than others." In re Glunk, 342 B.R. at 735.  Noting, "[i]t should be the rare case that merits dismissal for lack of good faith in the absence of some evidence indicative of categories 3 and 4, both of which involve some degree of misconduct by the debtor." Id.  As stated, neither categories 3 nor 4 weigh in favor of a finding of bad faith *sub judice.*

As for the remaining categories (1, 2, and 5), the Court also finds that these do not support dismissal of the Debtor's case.  There is no allegation that the

Debtor is living a lavish lifestyle or has an ability to repay the debt. In fact, it was the Debtor's inability to confirm a repayment plan which spurred the Debtor's conversion to chapter 7.

With respect to whether the Debtor's bankruptcy case will have a disproportionate impact on IBS, the Court observes that the Debtor has other creditors, both secured and unsecured. See Schedules D and E/F, ECF NO. 13, 12-17. However, even if IBS (as the Debtor's largest creditor) were to be considered the Debtor's primary creditor, that alone is insufficient to merit a bad faith finding.  As Judge Frank wrote,

> Frequently, the need for bankruptcy relief is caused by one particular event that upsets the equilibrium in a debtor's pre-bankruptcy economic life. For example, a catastrophic illness can result in one staggering hospital bill. Or, one ruinous business transaction can cause a previously successful small business to fail, leaving the debtor-principal with liability on a very large guaranteed debt. In both circumstances, the debtor may have little prospect of generating sufficient income to repay the one, major debt. These kinds of debtors invoke their rights under the Bankruptcy Code as a means to obtain relief from burdensome debt and obtain a fresh start—which are conventional, traditional and acceptable purposes.
>
> These examples illustrate that simply because a debtor has only one primary creditor, that fact by itself cannot ordinarily establish that the debtor's desire to obtain a discharge is an abuse of the purpose, spirit or provisions of the Bankruptcy Code and therefore, may shed little light on the question whether a debtor's filing is good faith. For a debtor's "debt structure" to take on bad faith significance when there is only one primary creditor, ordinarily there must be some other factor at play, such as prepetition machinations to avoid payment, transfer of assets beyond the reach of the main creditor or some undue interference with an orderly judicial process for resolution of the primary debt

In re Glunk, 342 B.R. at 736.

No such "prepetition machinations," transfers, or acts of interference are present in the instant case before the Court.

Finally, as to the fundamental fairness of the Debtor obtaining bankruptcy relief, the Court noted above that in pursuing this Motion to Dismiss IBS is attempting to impose upon the Debtor all the detriments of a bankruptcy filing, while denying him the benefit of a discharge. The record reflects that the Debtor has subjected his unexempt assets to sale and they have been liquidated for the benefit of his creditors. With the other factors weighing against a finding of bad faith, it would be fundamentally unfair to deny the Debtor his discharge under the circumstances.

Accordingly, the <u>Glunk</u> categories weigh against dismissal.

**IV.**

Based on the foregoing, the Court finds that IBS's Motion to Dismiss is untimely. However, to the extent that it could be viewed as timely, the Court nonetheless denies the Motion to Dismiss on the merits. Although the Debtor's case has not been without its hiccups, the totality of the circumstances shows that the Debtor has acted in good faith in both commencing his chapter 13 case and through the subsequent conversion to chapter 7.

Accordingly, this Court shall enter an order denying the Motion to Dismiss.

Dated: May 11, 2021

jlh

_____
Hon. Jeffery A. Deller
United States Bankruptcy Judge

FILED
5/11/21 12:02 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

27

**Case Administrator to Mail to**:
Debtor
Paul W. McElrath, Jr., Esq.
John J. Berry, Esq.
Eric E. Bononi, Chapter 7 Trustee